UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ABDUL MANSOUR and JULIA
MANSOUR, husband and wife,

      *Plaintiffs*,

      v.

BRITISH AIRWAYS PLC, a foreign
Corporation; HUNTLEIGH USA
CORPORATION,

      *Defendants*.

CASE NO. 2:18-cv-01757-BJR

ORDER GRANTING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT

## I. INTRODUCTION

This matter comes before the Court on a motion by Plaintiffs Abdul and Julia Mansour seeking partial summary judgment on liability against Defendants British Airways, PLC ("British Airways") and Huntleigh USA Corporation ("Huntleigh").[1] Dkt. No. 34. The case involves Plaintiffs' claim that British Airways along with Huntleigh, its subcontractor responsible for

---

[1] Plaintiffs request oral argument. Dkt. No. 34 at 1. The Court finds that oral argument is unnecessary and will proceed on the papers.

1

providing services to passengers with disabilities, failed to safely board Mr. Mansour, who uses a wheelchair, onto his British Airways flight from Seattle to London. Defendants oppose summary judgment. Dkt. No. 35. Having reviewed the Motion, the opposition thereto, the record of the case, and the relevant legal authorities, the Court will grant Plaintiffs' Motion. The reasoning for the Court's decision follows.

## II. BACKGROUND

Mr. Mansour was rendered tetraplegic after a childhood accident in Beirut, Lebanon. On January 10, 2018, he and his wife were booked to travel from Seattle-Tacoma International Airport to London aboard a British Airways flight. Dkt. No. 1 at ¶¶ 3.2–3.4.

Prior to the flight's departure, Mr. Mansour maneuvered his personal electric wheelchair to the end of the Jetway where he awaited assistance to board the aircraft. *Id.* at ¶ 3.5. Three Huntleigh employees, including Lenny Tala and Abdinasir Fahiye, transferred Mr. Mansour from his personal wheelchair to a special wheelchair designed to be narrow enough to travel down the aisles of an aircraft. Dkt. No. 34 at 3. The employees then strapped Mr. Mansour into this chair. *Id.*

Mr. Tala and Mr. Fahiye then attempted to lift Mr. Mansour from the end of the Jetway into the aircraft. *Id.* In the process of doing so, the wheelchair became unbalanced and tipped over, dropping with Mr. Mansour in it. *Id.* at 4. Mr. Mansour alleges that as a result he sustained "serious bodily injury" including loss of consciousness and a laceration to his head that required the attention of Ms. Mansour, a trained nurse, during the flight and additional medical attention after his arrival. Dkt. No. 1 at ¶ 3.6. According to Plaintiffs, this incident left Mr. Mansour with lasting physical injury, emotional distress, and loss of income and Ms. Mansour with emotional

2

distress. Dkt. No. 1 at ¶¶ 6.3–6.4; *see also* Dkt. No. 34-2 at ¶¶ 10–14 (Declaration of Abdul Mansour describing persistent pain and injury since the incident).[2]

On December 7, 2018, Plaintiffs filed the current suit, alleging two causes of action, including claims under (1) the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106-45, 2242 U.N.T.S. 350 (commonly referred to as the "Montreal Convention"), *id.* at ¶¶ 4.1–4.5, and (2) the Air Carrier Access Act, 49 U.S.C. § 41705, *id.* at ¶¶ 5.1–5.8. Plaintiffs move for partial summary judgment on Defendants' liability under the Montreal Convention.

### III.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under this standard, a dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and a fact is material if it might "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Karasek v. Regents of the Univ. of California*, 948 F.3d 1150, 1161 (9th Cir. 2020).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmovant will bear the burden of proof at trial, the movant "need only point out 'that there is an absence of

---

[2] Additionally, Mr. Mansour claims that Defendants failed to inform him of his right to pursue an enforcement action and failed to properly investigate the incident as required by the Air Carrier Access Act, 49 U.S.C. § 41705. *Id.* at ¶ 3.7.

3

evidence to support the nonmoving party's case'" to meet their initial burden. *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (quoting *Celotex*, 477 U.S. at 325). Where the movant meets this burden, to avoid summary judgment the nonmovant must "set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion." *Macareno v. Thomas*, 378 F. Supp. 3d 933, 940 (W.D. Wash. 2019) (citing *Anderson*, 477 U.S. at 250).

In considering a motion for summary judgment, the Court "views the evidence and draws inferences in the light most favorable to the non-moving party." *Providence Health & Servs. v. Certain Underwriters at Lloyd's London*, No. 18-cv-495, 2020 WL 816044, at *4 (W.D. Wash. Feb. 19, 2020) (citing *Anderson*, 477 U.S. at 255). At the same time, the Court need not "ignore undisputed evidence produced by the movant." *L. F. v. Lake Washington Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020) (citing *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001)). Nor may a summary judgment motion be defeated by "relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Kramer v. Safeco Ins. Co. of Oregon*, No. 19-cv-5365, 2019 WL 6896690, at *4 (W.D. Wash. Dec. 18, 2019) ("[c]onclusory, non-specific statements in affidavits are not sufficient, and 'missing facts' will not be 'presumed'") (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990)).

### IV. DISCUSSION

The Montreal Convention governs "'all international carriage of persons, baggage or cargo performed by aircraft for reward,' [and] provides the exclusive remedy for international passengers seeking damages against airline carriers." *Narayanan v. British Airways*, 747 F.3d 1125, 1127 (9th Cir. 2014) (quoting *Montreal Convention* at art. 1(1)); *see also Lee v. Korean Air Lines Co.*,

4

No. 18-cv-1242, 2019 WL 77433, at *1 (W.D. Wash. Jan. 2, 2019); *Heinemann v. United Cont'l Airlines*, No. 11-cv-00002, 2011 WL 2144603, at *3–*4 (W.D. Wash. May 31, 2011).

Article 17 of the Convention provides that the "carrier is liable for damages sustained in case of . . . bodily injury" so long as "the accident which caused the . . . injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." *Montreal Convention* at art. 17(1). The parties stipulate that Mr. Mansour's injury was an "accident" that occurred during embarkation. Dkt. No. 35 at 4. Furthermore, Article 41 of the Convention provides that "acts . . . of the actual carrier and of its servants and agents acting within the scope of their employment shall . . . be deemed to be also those of the contracting carrier." *Id.* at art. 41(1). Thus, British Airways and Huntleigh are mutually liable for the alleged incident.

Article 21 is the compensation provision of the Convention. That Article provides a two-tiered system which allows a carrier to cap its liability if it can prove it was not negligent. First, Article 21(1) establishes a minimum liability of 100,000 Special Drawing Rights ("SDRs")[3] by providing that a carrier "shall not be able to exclude or limit its liability" for damages less than 100,000 SDRs. *Montreal Convention* at art. 21(1). Article 21(2), however, provides that a carrier will not be liable for damages in excess of 100,000 SDRs if "the carrier proves that" a claimant's injury was "not due to the negligence or other wrongful act or omission of the carrier or its servants or agents." *Montreal Convention* at art. 21(2); *see also Smith v. Am. Airlines, Inc.*, No. 09-cv-

---

[3] A "Special Drawing Right" is an "international reserve asset created by the International Monetary Fund ("IMF") that can be exchanged for the currencies of IMF members." *Armstrong v. Hawaiian Airlines, Inc.*, 416 F. Supp. 3d 1030, 1040 (D. Haw. 2019) (citing INTERNATIONAL MONETARY FUND, *Special Drawing Right (SDR) Factsheet*, https://www.imf.org/en/About/Factsheets/Sheets/2016/08/01/14/51/Special-Drawing-Right-SDR (last visited April 9, 2020)).

5

02903, 2009 WL 3072449, at *2 (N.D. Cal. Sept. 22, 2009) (citing *Kruger v. United Air Lines, Inc.*, 481 F.Supp.2d 1005, 1008 (N.D.Cal.2007)). Thus, Article 17(1) creates a form of strict liability against carriers, but Article 21 permits a carrier to limit its liability to 100,000 SDRs if it can prove it was not negligent. *See Lee v. Air Canada*, 228 F. Supp. 3d 302, 311–14 (S.D.N.Y. 2017). Defendants do not contest their liability for the 100,000 SDR damages pursuant to Articles 17 and 21(1). However, they argue that they were not negligent and, therefore, their liabilities should be capped at the 100,000 SDRs. The burden of proving their non-negligence is on Defendants. *Montreal Convention* at art. 21(2).

The Court looks to Washington law for the standard of negligence. *See Lee*, 228 F. Supp. 3d at 312 (applying New York law for negligence claim under the Montreal Convention). Under Washington law, to establish their non-negligence, Defendants must prove they did not have a duty, they did not breach that duty, there was no resulting injury, or there was no proximate causation. *Ranger Ins. Co. v. Pierce Cty.*, 192 P.3d 886, 889 (Wash 2008). Defendants do not dispute that they owed Mr. Mansour a duty, his injury, or the causation of that injury. *See* Dkt. No. 35 at 5. Instead, Defendants argue a lack of breach based on their fulfillment of a common carrier's duty to its passenger. *Id.* at 5–6.

Plaintiffs have presented sufficient evidence to fulfill their initial burden of demonstrating Defendants' breach of their duty to Mr. and Ms. Mansour. As they highlight, the testimony of Huntleigh's own employees indicates the employees simply lost control of the aisle chair while lifting it. *See* Dkt. No. 34-1 at 17–18 (Incident Report of Lenny Tala stating "while we lift him [Mr. Fahiye] was using one hand to lift the chair cause his other hand was lifting the passengers leg so that's he loose control cause when [Mr. Fahiye] was lifting the chair wasn't balance")

6

(quoted verbatim); *id.* at 25 (Statement of Abdinasir Fahiye providing "after I took few steps back during that time, we lost the balance of the passenger and he fell") (quoted verbatim); *see also* Dkt. No. 38 at 3–4 (Declaration of Abdinasir Fahiye stating "I do not know what happened that caused the aisle chair to become unbalanced and Mr. Mansour to fall" and that "[d]uring this very brief time that the aisle chair was in the air, just a few seconds, the aisle wheelchair and Mr. Mansour started to wobble. I do not know why it started to wobble. We then lost balance of the chair, and Mr. Mansour fell to his left.").

Defendants, in turn, rely on two pieces of evidence to establish that they were not negligent. *See* Dkt. No. 35 at 6–7. First, Defendants point to the Declaration of Mr. Fahiye in which he attests that he "felt confident that Mr. Mansour could be safely transported onto the aircraft." Dkt. No. 35 at 6 (citing Dkt. No. 38 at 2 ("I felt that I was strong enough to safely perform this service"); *id.* at 3). Such conclusory statements, however, fail to create an issue of fact. *See Kramer,* 2019 WL 6896690, at *4. Furthermore, as quoted above, this testimony actually serves as evidence of negligence as even Mr. Fahiye in his Declaration admits that he and Mr. Tala lost control of the wheelchair mid-lift causing Mr. Mansour to fall to the ground. Dkt. No. 38 at 4.

Second, Defendants point to their employees' compliance with Huntleigh's internal policy on assisted wheelchair boarding. While such "[i]nternal directives, department policies, and the like may provide evidence of the standard of care," they do not establish that it is an acceptable practice for employees to lose control of a wheelchair they are boarding so that the chair and its occupant are dropped. *Joyce v. State, Dep't of Corr.*, 119 P.3d 825, 834 (Wash. 2005). It is patently obvious that where employees lose control of a wheelchair they are lifting to such an extent that its occupant is dropped and injured, the employees' performance does not conform to

7

an acceptable standard of care.  Nor could any reasonable jury find otherwise.

The Court finds that Defendants have failed to adduce sufficient evidence upon which a reasonable jury could find that Defendants were not negligent.

## V.     CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Plaintiff's Motion for Partial Summary Judgment as to Defendants' liability to the full extent available under Article 21 of the Montreal Convention.

DATED this 13th day of April, 2020.

*Barbara J. Rothstein*
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE